UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
HADASSAH GURFEIN, individually and
on behalf of all others similarly
situated,

               **Plaintiff,**         04 Civ. 9526 (LLS)

      **v.**                         **OPINION and ORDER**

AMERITRADE, INC., AMERITRADE ONLINE
HOLDINGS CORP., KNIGHT TRADING,
GROUP, LLC, KNIGHT FINANCIAL
PRODUCTS, LLC, KNIGHT EXECUTION
PARTNERS, LLC and AMERICAN STOCK
EXCHANGE, LLC,

              **Defendants.**
------------------------------------x

In this class action alleging violations of federal law, state law, and SEC Rule 10b-5, defendants[1] move to dismiss the amended complaint pursuant to Fed. R. Civ. P. 12(b)(6).

<u>BACKGROUND</u>

The allegations arise from activities related to options trading. The amended complaint alleges misrepresentations and manipulative acts, committed with

---

[1] The defendants are Ameritrade Holding Corporation (referred to in the amended complaint as Ameritrade Online Holdings Corp.), its wholly owned subsidiary Ameritrade, Inc. (collectively, the "Ameritrade Defendants"), Knight Trading Group, LLC, and its wholly owned subsidiaries, Knight Financial Products, LLC and Knight Execution Partners, LLC (collectively, the "Knight Defendants"), and the American Stock Exchange, LLC.

the purpose of defrauding "direct access" on-line customers in the options market. The following allegations are taken from the amended complaint and are accepted as true on a motion to dismiss. See Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993).

The American Stock Exchange ("AMEX") is registered as a national securities exchange and provides a marketplace for trading option contracts. The AMEX assigns every option traded on its exchange to a broker-dealer, or options specialist, who is responsible for maintaining a "fair and orderly market" for the option and providing bid and ask quotations. Amended Cmplt. ¶¶ 57-58. These are published to investors through electronic transfer or display systems. Id. ¶ 59. Buy and sell offers are "either matched against one another by a specialist, or are matched with counterbalancing offers from the specialist itself, who is essentially required to act as a market maker of last resort." Id. ¶ 54.

Numerous order-handling rules govern the options market, including the Firm Quote Rule, which requires every responsible broker or dealer (including options specialists) to execute options transactions at prices at least as favorable as their published bids or offers at the time the orders are presented. SEC Exchange Act Rule

11Ac1-1; AMEX Rule 958A. The AMEX's regulatory duties include enforcing compliance by its member specialists with all of the order-handling rules, including the Firm Quote Rule. The SEC, in turn, monitors the AMEX's exercise of that regulatory authority.

Knight Financial Products, LLC ("Knight Financial") is an options specialist and registered broker-dealer operating on the AMEX. Ameritrade, Inc ("Ameritrade") is a broker-dealer who provides individual investors with direct online access to financial markets so they can trade securities from their personal computers. These investors are called "direct access" customers. Through Ameritrade, options quotations are displayed on a direct access customer's computer, and the customer can "click" on the price shown on the screen and thus buy or sell the listed option. The orders are then routed to the appropriate exchange. Options specialists like Knight Financial provide trade executions to services like Ameritrade. Knight Execution Partners, LLC ("Knight Execution") is the clearing house through which Knight Financial routes its orders.

In 2003, the SEC's Office of Compliance Inspections and Examinations and Office of Economic Analysis reviewed the AMEX's regulatory programs related to options order

handling, and analyzed audit trail data of 10 options traded on the AMEX during the week of October 22, 2001. The staff then compiled a report[2] (the "OCIE Report") stating their findings of deficiencies in the AMEX's detection and discipline of routine violations of the Firm Quote Rule by options specialists. The staff also found that the options specialists "may" have been routinely discriminating against direct access customers in "likely" violation of the Firm Quote Rule. OCIE Report, Exhibit A of Amended Cmplt. at 9.[3] The OCIE report did not name the options specialists involved in the inspection, nor mention the Knight or Ameritrade defendants. The AMEX was the only named entity against whom concrete allegations of wrongdoing were made.

Plaintiff Hadassah Gurfein is a private investor who maintained an account with Ameritrade. On December 6, 2002 Gurfein attempted to sell Forest Labs options contracts through Ameritrade. At 8:53:34 A.M. (CST) Gurfein placed an order to sell 50 Forest Labs December 100 put contracts at $7.70. The "bid" price displayed on Gurfein's monitor at the time she prepared to place her order was $7.70, but

---

[2] The report reflected the views of the staff, not the Commission.
[3] The copy of the OCIE Report attached to the amended complaint did not contain page numbers. Defendant Knight Trading attached a self-paginated copy of the OCIE Report in Exhibit D to their May 11, 2005 Memorandum of Law. The page numbers cited correspond to the numbers in that exhibit.

increased to $7.80 as she placed her sell order. By 8:56:21 A.M. the order had not been executed, and Gurfein cancelled it. She attempted several more times to sell her puts, each time offering a price at or below the electronically displayed bid, and each time the order was not executed instantaneously and was cancelled by Gurfein. In order to "salvage a rapidly decreasing unrealized gain," Gurfein exercised her 50 Forest Labs December 100 put contracts by purchasing 5,000 common shares of Forest Labs, which she then immediately sold for an overall profit of approximately $20,500. Amended Cmplt. ¶ 110. Gurfein alleges that she suffered a loss of approximately $13,500, the difference between the profit she would have realized if her first trade had been executed at $7.70 ($34,000) and the $20,500 profit she actually obtained.

The same day, Gurfein tried to sell 100 Forest Labs February 85 puts through Ameritrade. She submitted an order to sell all 100 contracts at $4.50, a price below the electronically displayed bid. Only 25 of the contracts were sold, and at a price of only $3.00. The remaining 75 contracts were subject to a 2-for-1 split in January 2003 and ultimately sold at a price of $.20 each, for a total of $3,000. Gurfein alleges a total loss of $34,500 on this transaction, reflecting the difference between what she

would have made if all 100 options had been sold at $4.50 ($45,000) and the $10,500 she actually made. Gurfein attributed the quotations on her computer throughout her December 6th trading activity to both "defendant Knight"[4] and Ameritrade.

Gurfein claims that those transactions, coupled with the findings in the OCIE Report, show repeated misrepresentations and a scheme by defendants to defraud the options market through illegal trading. She alleges that defendants materially misrepresented both bid and ask quotations, and that orders placed by direct access customers would be executed instantaneously. As part of the scheme (1) Ameritrade intentionally routed its customers' orders to Knight, and defendants (2) refused to execute direct access orders at the quoted prices, (3) discriminated against direct access customers by not executing their orders, or executing them at less favorable prices than those given to preferred customers, (4) changed or "faded" options quotations after plaintiff clicked on them, and (5) the AMEX ignored the violations and allowed the scheme to continue. As a result, defendants reaped

---

[4] As discussed in Section II.B, plaintiff lumps Knight Financial and Knight Execution together throughout the amended complaint, referring to them both as "Knight." Any reference in this opinion to "Knight" or "defendant Knight" is a reflection of the allegations made by plaintiff.

profits, while plaintiff lost profits and suffered losses. Amended Cmplt. ¶¶ 112 and 123.c.


## DISCUSSION

On a motion to dismiss a complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted, a court must accept the factual allegations of the complaint as true, and draw all inferences in favor of the plaintiff. <u>Mills</u>, 12 F.3d 1170 at 1174. The court may consider exhibits annexed to the complaint or incorporated in it by reference. <u>Brass v. American Film Technologies, Inc.</u>, 987 F.2d 142, 150 (2d Cir. 1993). The complaint may be dismissed only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102 (1957).


I.  <u>The American Stock Exchange</u>

The AMEX moves to dismiss counts I (for a fraudulent scheme and material misrepresentations in violation of section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5), II (for control-person liability under

section 20(a) of the Securities Exchange Act of 1934), and VII (for violation of New York General Business Law § 349) on the grounds that it is entitled to absolute immunity.

The claims against the AMEX stem from two separate courses of conduct: (1) the AMEX's failure to regulate its options specialists' behavior and (2) statements made by the AMEX about its implementation of the Firm Quote Rule.

The AMEX is registered with the Securities and Exchange Commission as a national securities exchange pursuant to section 6 of the Securities Exchange Act of 1934, 15 U.S.C. § 78f, and is a self-regulatory organization ("SRO") as defined in 15 U.S.C. § 78c(a)(26). As an SRO, the AMEX has a duty to "promulgate and enforce rules governing the conduct of its members" and "conducts disciplinary proceedings when a member, or a person associated with a member, is suspected of violating federal securities laws or internal Exchange rules or regulations." Barbara v. New York Stock Exchange, Inc., 99 F.3d 49, 51 (2d Cir. 1996). See 15 U.S.C. §§ 78f(b), 78s(g), and 78f(d). The SEC has broad authority to oversee the AMEX's activities and to impose sanctions if it fails to carry out its responsibilities as an SRO. 15 U.S.C. §§ 78f(b), 78s(h)(1).

The AMEX argues that the doctrine of absolute immunity bars plaintiff's claims because they involve the AMEX's exercise of, or failure to exercise, its regulatory authority. Plaintiff contends that the AMEX's conduct went beyond mere failure to regulate its specialists, and amounted to fostering and supporting their misbehavior.

The Second Circuit first granted absolute immunity to an SRO in Barbara v. New York Stock Exchange, 99 F.3d 49 (2d Cir. 1996). There plaintiff sought money damages from the New York Stock Exchange for misconduct associated with disciplinary proceedings it administered. The Court explained the importance of extending absolute immunity to national securities exchanges:

> We think that absolute immunity is particularly appropriate in the unique context of the self-regulation of the national securities exchanges. Under the Exchange Act, the Exchange performs a variety of regulatory functions that would, in other circumstances, be performed by a government agency. Yet government agencies, including the SEC, would be entitled to sovereign immunity from all suits for money damages. As a private corporation, the Exchange does not share in the SEC's sovereign immunity, but its special status and connection to the SEC influences our decision to recognize an absolute immunity from suits for money damages with respect to the Exchange's conduct of disciplinary proceedings.

Barbara, 99 F.3d at 59 (internal citations omitted).

In D'Alessio v. New York Stock Exchange, Inc., 258 F.3d 93, 105 (2d Cir. 2001), the Second Circuit granted the

NYSE absolute immunity from D'Alessio's tort and contract claims arising from being banned from the exchange's trading floor, an exercise of quasi-governmental power delegated to the NYSE:

> Thus, although the immunity inquiry in <u>Barbara</u> was confined to the NYSE's conduct in connection with disciplinary proceedings, <u>Barbara</u> stood for the broader proposition that a SRO, such as the NYSE, may be entitled to immunity from suit for conduct falling within the scope of the SRO's regulatory and general oversight functions.

258 F.3d at 105. Finding that the NYSE's alleged misconduct was related to "proper functioning of the regulatory system," the Court held that "the NYSE, when acting in its capacity as a SRO, is entitled to immunity from suit when it engages in conduct consistent with the quasi-governmental powers delegated to it pursuant to the Exchange Act and the regulations and rules promulgated thereunder." <u>Id</u>. at 106. It stated that the NYSE "as a SRO, stands in the shoes of the SEC in interpreting the securities laws for its members and in monitoring compliance with those laws. It follows that the NYSE should be entitled to the same immunity enjoyed by the SEC when it is performing functions delegated to it under the SEC's broad oversight authority." <u>Id.</u> at 105.

To determine the scope of the absolute immunity, "we look not at the manner in which D'Alessio casts his claims

against the NYSE (<u>i.e.</u>, tort or contract), but rather to the alleged misconduct of the NYSE as detailed in the complaint." <u>D'Alessio</u>, 258 F.3d at 105-06. Thus, if the alleged misconduct of the AMEX in this case relates to its regulatory and oversight functions, absolute immunity bars the claims.

Plaintiff's allegations against the AMEX include the following:

> As previously alleged above, and as alleged below in greater detail, the AMEX has so egregiously failed in its regulatory mission to police and enforce options order handling by its members as to become an active, willing, and necessary participant in the actual commission of the fraudulent and deceptive practices and scheme alleged herein. (Amended Cmplt. ¶ 27.)
>
> On April 2, 2001, the start of the Class Period, AMEX represented to investors that it was implementing the Firm Quote Rule for option purchases and sales occurring on the AMEX. In connection with the implementation of the Firm Quote Rule, the AMEX issued a notice to its traders which was publicly disseminated via the AMEX's website. . . . As detailed herein, these statements were and continue to be knowingly, or recklessly materially false and misleading due to the AMEX's serial and ongoing failures to ensure that the AMEX options Specialists comply with On-line Public Customers could enter [<u>sic</u>] purchase and sale orders and have them executed in a fair and orderly market. (<u>Id</u>. ¶¶ 74-75.)
>
> The SEC also found that the AMEX failed to enforce the Firm Quote Rule and employed incorrect or inadequate review procedures in its analysis and investigation of potential Firm Quote Rule violations. This caused the AMEX to conclude improperly that Firm Quote Rule

violations had not occurred. Moreover, when the AMEX did conclude that a Firm Quote Rule violation had occurred, it failed to discipline its member(s) in any meaningful way. (<u>Id</u>. ¶ 89.)

In short, the AMEX: (1) ignored the requirements of the Firm Quote Rule; (2) employed grossly deficient review procedures relating to the Firm Quote Rule; (3) created illegitimate exceptions to the Firm Quote Rule; and (4) failed to identify Firm Quote Rule violations raised in customer complaints. (<u>Id</u>. ¶ 90.)

In addition, misstatements and omissions of material facts were made intentionally or recklessly by Defendant AMEX, in order to deceive the investing public and regulators and permit its options specialists members, including Knight, to continue the unlawful conduct. (<u>Id</u>. ¶ 113.)

During the Class Period, the AMEX was grossly reckless or had actual knowledge of the violations of the Firm Quote Rule and other improper practices engaged in by the AMEX Options Specialists, including Defendant Knight, through numerous customer complaints reported to the AMEX and the SEC; internal reports which the AMEX generated to show violations of Firm Quote Rule and other trading violations; its repeated failures to refer violations to its disciplinary committee or otherwise enforce disciplinary rules against its members; various SEC inspections and reports as described herein which described defendants' misconduct in detail; and its failure to implement the surveillance, investigative and enforcement processes required by the Sanctions Order. (<u>Id</u>. ¶ 115.)

Defendant AMEX by virtue of its authority as a self-regulatory organization and by virtue of its obligation to maintain various regulatory programs such as surveillance, investigative and disciplinary programs related to options order handling that are supposed to be designed to enforce compliance not only with the AMEX's own rules and regulations but also with the federal securities laws and regulations, is a controlling

person of the AMEX Options Specialists, including defendant Knight. (<u>Id</u>. ¶ 125.)

To the extent that the claims are based on the AMEX's alleged failure to properly monitor and discipline its specialists' behavior, duties clearly "falling within the scope of the SRO's regulatory and general oversight functions," it is protected by absolute immunity. <u>See</u> <u>In re NYSE Specialists Securities Litigation</u>, No. 03-8264 (RWS), 2005 U.S. Dist. LEXIS 32597, at *51 (S.D.N.Y. Dec. 13, 2005)(holding that plaintiffs' claims "that NYSE deliberately failed to supervise and discipline the specialist firms" were barred by the doctrine of absolute immunity).

AMEX's statements that it would implement the Firm Quote Rule are similarly protected. Promulgating rules is an essential component of the AMEX's regulatory authority. Attendant to that duty is the need to publish notices announcing the content and implementation of these rules. "For '[w]ithout the capacity to make announcements, defendants would be stripped of a critical and necessary part of their regulatory powers,'–namely, the power to inform the public of those actions it has undertaken in the interest of maintaining 'a fair and orderly market' or protecting 'investors and the public interest.'" <u>DL</u>

Capital Group v. Nasdaq Stock Market, 409 F.3d 93, 98 (2d
Cir. 2005) (internal citations omitted)(affirming Nasdaq's
absolute immunity for statements announcing the suspension
of trading, despite plaintiff's argument that while the
suspension of trading was a regulatory action, the
announcement of it was not).

Plaintiff's argument that the AMEX's "willful
undermining of the laws that it is required to enforce"
precludes absolute immunity is equally unavailing.  Plaint.
Opp. Mem. at 51.  The Second Circuit explicitly refused to
recognize a fraud exception to an SRO's absolute immunity
in DL Capital Group v. Nasdaq Stock Market.  In response to
plaintiff's argument that the Nasdaq was not entitled to
absolute immunity because the suit alleged fraud, the Court
held:

> However, precedent, not to mention common sense,
> strongly militates against carving out a "fraud"
> exception to SRO immunity.  As to precedent, this
> Court has already implicitly held that SROs are
> absolutely immune to suits alleging fraud.  In
> D'Alessio, after all, we upheld the dismissal of
> all the plaintiffs' claims even though one of the
> claims was for "fraudulent deceit and
> concealment."  Not only that, but this Court has,
> in other contexts, made clear that allegations of
> bad faith, malice, and even fraud – all of which
> may be relevant to a qualified immunity analysis
> – cannot, except in the most unusual of
> circumstances, overcome absolute immunity.

DL Capital Group, 409 F.3d at 98 (emphasis in original)(internal footnotes and citations ommitted). There is sound reason for the Court's insistence on absolute immunity, even in the presence of charges of affirmative misconduct (such as fraud) by the exchange:

> As a matter of common sense, too, it behooves the Court not to carve out a fraud exception to the absolute immunity of an SRO. It is, after all, hard to imagine the plaintiff (or plaintiff's counsel) who would - when otherwise wronged by an SRO but unable to seek money damages - fail to concoct some claim of fraud in order to try and circumvent the absolute immunity doctrine. Thus, rejecting a fraud exception is a "matter not simply of logic but of intense practicality since [otherwise] the [SRO's] exercise of its quasi-governmental functions would be unduly hampered by disruptive and recriminatory lawsuits." See D'Alessio, 258 F.3d at 105, quoting D'Alessio v. New York Stock Exchange, Inc., 125 F.Supp.2d 656, 658 (S.D.N.Y. 2000).

Id. at 99. Finally, even if it could be argued, on the factual allegations in the amended complaint, that the AMEX aided and abetted violations of the securities laws by its members, that would not impose § 10(b) liability. Central Bank of Denver, N.A. v. First Interstate Bank of Denver, 511 U.S. 164 (1994).

Accordingly, the claims against the American Stock Exchange are dismissed with prejudice.


II. The Ameritrade and Knight Defendants

-15-

Claim one alleges violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Ameritrade and the Knight defendants move to dismiss this claim for failure to plead fraud with particularity as required by Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act ("PSLRA").

Section 10(b) makes it unlawful to:

> use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). SEC Rule 10b-5 makes it unlawful, in connection with the purchase or sale of any security:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person

17 C.F.R. § 240.10b-5.

Plaintiff's allegations intertwine and reproduce the language of sections (a), (b) and (c) of Rule 10b-5:

> During the Class Period defendants, singly and in
> concert, directly and indirectly, engaged in a
> common plan, scheme, and unlawful course of
> conduct, pursuant to which they knowingly or
> recklessly, engaged in acts, transactions,
> practices and courses of business which operated
> as a fraud and deceit upon Plaintiff and other
> members of the Class, and made various deceptive
> and untrue statements of material facts and
> omitted to state material facts, in order to make
> the statements made, in light of the
> circumstances under which they were made, not
> misleading to Plaintiff and members of the Class.

Amended Cmplt. ¶ 121. In effect, this attempts to assert

liability under each of the Rule 10b-5 subdivisions. <u>See</u>

<u>In re Alstom SA Securities Litigation</u>, No. 03 Civ. 6595

(VM), 2005 U.S. Dist. LEXIS 35641, at *99-100 (S.D.N.Y.

Dec. 22, 2005)(noting that liability can arise under all

three subsections of Rule 10b-5 "out of the same set of

facts, where the plaintiffs allege both that the defendants

made misrepresentations in violations of Rule 10b-5(b), as

well as that the defendants undertook a deceptive scheme or

course of conduct that went beyond the

misrepresentations").

To state a claim under the Rule's subdivisions (a) or

(c), plaintiff must allege that the defendant "(1)

committed a manipulative or deceptive act (2) in

furtherance of the alleged scheme to defraud, (3) scienter,

and (4) reliance." <u>In re Global Crossing, Ltd. Securities</u>

<u>Litigation</u>, 322 F.Supp.2d 319, 336 (S.D.N.Y. 2004). The

complaint "must specify 'what manipulative acts were performed, which defendant performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue.'" <u>S.E.C. v. U.S. Environmental, Inc.</u>, 82 F.Supp.2d 237, 240 (S.D.N.Y. 2000)(quoting <u>T.H.C., Inc. v. Fortune Petroleum Corp.</u>, 1999 U.S. Dist. LEXIS 4039, *10 (S.D.N.Y. Mar. 31, 1999)).

The elements necessary to a claim under the Rule's subdivision (b) are that defendant "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." <u>In re IBM Corporate Securities Litigation</u>, 163 F.3d 102, 106 (2d Cir. 1998). Under Fed. R. Civ. P. 9(b), "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

In addition, the PSLRA requires that in allegations of misrepresentations:

> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).

The amended complaint fails in several ways to meet those pleading requirements.

A.   Basis for Claims of Fraud

Plaintiff claims that defendants made misrepresentations and engaged in "improper market practices" including "failing to execute class members' limit purchase and sell orders at specifically displayed quotes, discriminating against purchase and sell orders of On-Line Public Customers, [and] violating the Firm Quote Rule." Amended Cmplt. ¶ 2.   See also Amended Cmplt. ¶ 21 ("However, Ameritrade refused to execute Plaintiff's options orders at the real time quoted prices and defendant Knight, one of the AMEX Options Specialists, refused to honor the Firm Quote Rule or executed Plaintiff's orders behind the orders of its preferred customers."); Amended Cmplt. ¶ 81 ("[T]he AMEX and the AMEX Options Specialists, including Defendant Knight, have misused order routing and execution systems to manipulate the bid or ask price on options trades placed by On-line Public Customers."). Plaintiff gives no specific instances.   While she points to her frustrated trades, she offers no proof that they failed because they were held "behind the orders of" other

customers or for any other reason than her cancellation of them after, _e.g._, three minutes.  Rather, she relies on the OCIE Report to support her contention that defendants[5] defrauded the market.  But the OCIE Report's generalized findings about activity on the AMEX, in support of its conclusion that the AMEX was not properly carrying out its regulatory duties, do not refer to any Knight defendant, nor to Ameritrade.  The OCIE Report does not carry plaintiff's burden of specifying a factual basis for her claims of securities law violations by the defendants.

The OCIE Report reflected a staff review of orders placed during the week of October 22, 2001 – more than a year before plaintiff's attempted trades.  The review covered ten options classes, which did not include Forest Labs, or over 1500 other options classes traded on the AMEX.  It was limited to orders placed through "the three primary direct access firms," not including Ameritrade.  It does not mention any Knight defendant, and they have established (in response to plaintiff's invitation) that no Knight defendant acted as a specialist for any of the options classes analyzed in the Report.  (See Knight defts' Ex. O, attached to their July 29, 2005 Reply Memo.)

---

[5] Because the AMEX is immune from liability, continued references to "defendants" refer to the Knight and Ameritrade defendants.

Since the OCIE Report's conclusions rest on different transactions by different specialists in different options classes, placed through different direct access firms, at times over a year earlier and not involving any defendant in this case, they cannot be taken as evidence of a defendant's participation in the scheme to defraud, or give rise to the "strong inference" of scienter necessary to state a securities-violation claim against the defendants. See 15 U.S.C. § 78u-4(b)(2)("the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind").

Without the support she seeks from the OCIE Report, plaintiff is left without a factual basis for asserting that Ameritrade's or Knight's representations were false when made; nor do the failures of execution of her orders on December 6, 2002 support that inference. More is required in a securities fraud case. As stated in Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 168 (2d Cir. 2005):

> Any fraud must be pled with particularity, Fed. R. Civ. P. 9(b); but the rule is applied assiduously to securities fraud. This Circuit's strict pleading requirements in securities-fraud cases, see Novak v. Kasaks, 216 F.3d 300, 307-10

(2d Cir. 2000), were (essentially) codified in the Private Securities Litigation Reform Act of 1995, id. at 309-11. So no claim should be filed unless and until it can be supported by specific factual allegations.


B.  Group Pleading

"Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud."  DiVittorio v. Equidyne Extractive Industries, Inc., 822 F.2d 1242, 1247 (2d Cir. 1987).  "To this end, the complaint may not rely upon blanket references to acts or omissions by all of the defendants, for each defendant named in the complaint is entitled to be appraised of the circumstances surrounding the fraudulent conduct with which he individually stands charged."  Red Ball Interior Demolition Corp., 874 F.Supp. at 584.

Plaintiff lumps defendants together at various points in the amended complaint, making allegations against "defendants," without specifying which defendant plaintiff is referring to:

> Defendants failed to disclose to Plaintiff and members of the Class that the published prices were not truthful and accurate and that limit orders placed by Plaintiffs and members of the Class would not be executed properly pursuant to AMEX and SEC regulations. (Id. ¶ 44.)

> Defendants affirmatively represented to Plaintiff and other On-line Public Customers, that (1) the displayed quotes were Firm Quotes at which transactions will occur and (2) when the customer "clicks" on the represented price (either to buy or sell) that the transaction is executed instantly. (Id. ¶ 61.)
>
> The Defendants failed to allow Plaintiff and other members of the Class to properly use their respective electronic trading systems and realize investment gains by: . . . Changing or "fading" the option price quoted through their respective electronic trading systems when "clicked" on by Plaintiff and others similarly situated. (Id. ¶ 123.b.)
>
> During the Class Period, Ameritrade and\or Knight materially misrepresented to Plaintiff and the Subclass, its ability to execute customers' options orders. Ameritrade's representations, set forth at ¶¶ 135 and 136, and incorporated herein by reference were materially false and misleading and omitted material facts concerning Defendants' misconduct in the handling and processing of purchase and sale orders of options on the AMEX. (Id. ¶ 123.d.)

"This sort of broad-brush allegation against numerous defendants is inadequate." O & G Carriers, Inc. v. Smith, 799 F.Supp. 1528, 1538-39 (S.D.N.Y. 1992). See also Three Crown Ltd. Partnership v. Caxton Corp., 817 F.Supp. 1033, 1040 (S.D.N.Y. 1993)("Throughout the complaint defendants are clumped together in vague allegations regarding 'some or all of the defendants.' Such wide-scale clumping is unacceptable.").

The amended complaint also fails to make any distinction between Knight Execution and Knight Financial,

referring to them collectively throughout the amended complaint as "Knight," and making all allegations generally against "defendant Knight" or "Knight." Amended Cmplt. ¶ 29.a ("Knight Financial and Knight Execution are collectively are [sic] referred to as 'Knight' at times herein."). See e.g. id. ¶¶ 81, 105, 110, 112, 118. Those are two separate entities, providing separate services in the options market, and the allegations against them must also be separate and specific. See Ellison v. American Image Motor Co., 36 F.Supp.2d 628, 641 (S.D.N.Y. 1999)("Because the complaint fails to separate these defendants with specific allegations of wrongdoing as to each one of them, the complaint does not pass muster under Rule 9(b).").

## III. Section 20(a) Claims

Plaintiff seeks to impose control person liability on Knight Trading and Ameritrade Holdings pursuant to Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a).

"In order to establish a prima facie case of liability under § 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the

controlling person was in some meaningful sense a culpable participant in the primary violation." Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998)(internal quotation marks omitted). "In the absence of a primary violation, a plaintiff cannot state a claim for controlling person liability under § 20(a) of the Securities Exchange Act." Salinger v. Projectavision, Inc., 972 F.Supp. 222, 235 (S.D.N.Y. 1997).

Because plaintiff does not adequately state a claim of Section 10(b) or Rule 10b-5 violation by Knight Financial, Knight Execution or Ameritrade, her Section 20(a) claims must be dismissed.


IV.  State Law Claims

Plaintiff asserts state law claims in claims three through seven. Because the defendants' motions to dismiss the federal claims are granted, the Court declines to exercise supplemental jurisdiction over these state law claims pursuant to 28 U.S.C. § 1367(c)(3)("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction."). Thus there is no need at this time for a determination whether those claims are barred by the

Securities Litigation Uniform Standards Act, 15 U.S.C. §
78bb(f)(1).

Accordingly, the state law claims are dismissed
without prejudice.

## CONCLUSION

Based on the foregoing, the amended complaint is
dismissed with prejudice as against the American Stock
Exchange. It is dismissed without prejudice as against the
other defendants, with leave to plaintiff to replead within
45 days.

So ordered.

Dated: New York, New York
      January 26, 2006

Louis L. Stanton

LOUIS L. STANTON
U.S.D.J.