UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED

07 JAN 31  PM 8: 56

U.S. DISTRICT COURT
S.D.N.Y.

------------------------------------------------------------------X

HADASSAH GURFEIN, individually and on behalf
of all others similarly situated,

                Plaintiff,

       v.

AMERITRADE, INC.,

              Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:

04 Civ. 9526 (LLS)
**THIRD AMENDED
CLASS ACTION COMPLAINT**

------------------------------------------------------------------X

Plaintiff, Hadassah Gurfein ("Plaintiff" or "Gurfein"), by and through her attorneys, for
her Third Amended Class Action Complaint against Defendant Ameritrade, Inc. ("Ameritrade")
alleges upon knowledge as to herself and her own circumstances, and upon information and
belief based on the investigation of her counsel as to all other matters, and states as follows:

## NATURE OF THE ACTION

1.     Plaintiff brings this class action based upon a straightforward breach of contract
claim.  During the period from April 2, 2001 through the date of this Complaint (the "Class
Period"), Plaintiff and the other members of the Class (defined in paragraph 4 below) entered
into brokerage agreements and contracted for brokerage services with Ameritrade on terms,
which included, both duties imposed on Ameritrade under the contract and duties incorporated
pursuant to the applicable rules and practices of the National Association of Securities Dealers
("NASD") and various exchanges.  Ameritrade's agreement with plaintiff (as well as other class
members) included contractual obligations to deliver and execute limit orders (*i.e.* an order to
buy or sell a specific volume of a security at a specific price) to multiple market centers at or
within the quoted bid and offer prices.  When an Ameritrade customer placed a limit order to buy

or sell an option that exactly matched the pending bid or ask price (or was within the bid and ask spread), according to the terms of the agreements between Plaintiff and Defendant, that order should have been directed to the appropriate options exchange to complete the execution at the quoted price. However, in numerous instances, Ameritrade breached its agreement and Plaintiffs' order was not distributed to multiple market centers and consequently, not executed.

2.      Ameritrade breached its agreement with Plaintiff and the Class in the following ways as more fully described below:

- Failed to distribute orders to multiple market centers;
- Failed to route orders to an exchange with the best matching bid or ask prices;
- Failed to execute orders through its designated agent at the best price available in violation of the best execution rule;
- Failed to conform to industry practices of executing limit orders which matched or were better than the quoted prices; and
- Failed to execute orders through its designated agent at the posted quote in violation of the firm quote rule.

3.      Unquestionably, in the business of executing securities transactions, time is of the essence as well as the availability to distribute orders to multiple market centers. In Plaintiff's particular circumstances, as set forth in greater detail below, Plaintiff submitted a series of limit orders to sell certain put options that either exactly matched or were better than the pending bid price, but rather than distribute these orders to multiple market centers as promised, they were sent only to the American Stock Exchange, LLC (the "AMEX"), where they were not executed either in whole or in part. On each occasion, as Plaintiff repeatedly cancelled her limit orders to respond to the unfilled order status, she entered a new order that either exactly matched or was

2

better than the quoted bid price. Ameritrade repeatedly breached its contractual obligation to direct the order to the appropriate or best options exchange for execution. In fact, equity options in Forest Labs which were the securities Plaintiff attempted to trade were listed on multiple options exchanges including the AMEX, the Chicago Board Options Exchange and the Philadelphia Stock Exchange.

4.      Plaintiff brings this action as a class action pursuant to rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of herself and all others similarly situated who were Ameritrade account-holders and used their Ameritrade electronic on-line accounts to place and/or direct limit-orders which matched the displayed quotation price to open and/or close put or call equity options positions with respect to all equity options listed on the exchanges from April 2, 2001 (the date on which the AMEX's firm quote rule became effective) through the date of this Complaint (the "Class Period") that were not executed at the displayed quotation price (the "Class"). As set forth in greater detail below (¶¶ 78-80), a report issued by the Securities and Exchange Commission (the "SEC") regarding the trading of options on the AMEX, ("the SEC Report") established that the failures visited upon Plaintiff with respect to her Ameritrade account and option orders that were supposed to be executed, routinely occurred on the AMEX with respect to other members of the Class as well.

5.      Among other things, the services that Ameritrade agreed to provide pursuant to its agreements with Plaintiff and class members were the following:

      a.      Ameritrade would use a "sophisticated order routing technology" in order to "dynamically distribute orders to multiple market centers in an effort to obtain best execution;" and

b.      Ameritrade as broker and agent for its on-line customers, would execute limit orders to buy and sell options that traded on various exchanges (through its sub-agents), in such a manner that when such orders were at the respective ask (for an option purchase) or bid (for a customer's option sale) price, they would be executed at that price.

6.      In fact, Ameritrade failed to perform its contractual obligations in the manner it agreed to, and as a result Plaintiff and the other members of the Class suffered injury by Ameritrade's failure to distribute orders to multiple market centers and/or execute purchase or sale limit orders at prices that matched displayed bid and ask prices.  As a result, Plaintiff and the other members of the Class were denied the agreed benefits of Ameritrade's electronic on-line trading accounts, including its "sophisticated order routing technology" and best execution of trades, and were denied larger profits or subjected to larger losses because Defendant failed to fulfill its contractual obligation to Plaintiff and the Class to distribute their limit orders to multiple market centers in order to be executed at the quoted limit prices.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this matter pursuant to the Class Action Fairness Act of 2005, Section 1332(d) of the Judicial Code, 28 U.S.C. § 1332(d), in that this is a putative class action in which the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and there is minimal diversity between the Class and Defendant, including between Gurfein (a citizen of New Jersey) and Ameritrade (a citizen of Delaware and Nebraska).

8.      Venue is proper in this District because Ameritrade has sufficient contacts with the Southern District of New York so as to make it subject to personal jurisdiction in this District, and venue in this Court therefore exists pursuant to section 1391 of the Judicial Code, 28 U.S.C. § 1391(c).  Among other things, many of the acts alleged herein, including Plaintiff's

numerous attempts to place orders to purchase or sell options were directed by Ameritrade to the AMEX which is located within this District.

**THE PARTIES**

9.     Plaintiff Hadassah Gurfein is a citizen of the State of New Jersey.  During the Class Period she entered into and maintained a brokerage account with Ameritrade through which she and/or her authorized representative were provided with on-line electronic access to securities markets, including but not limited to the ability to place orders to purchase and sell equity options.  Plaintiff's account at Ameritrade allowed her to transmit limit orders to purchase or sell equity options directly to Ameritrade, her broker, which then (with respect to the issues in the instant litigation) directed such orders to its sub-agent for what should have been best execution in accordance with the terms of the contract and industry practice and rules and regulations of the exchanges.

10.     During the Class Period, Defendant Ameritrade was a Delaware corporation and was in the business of providing self-directed investors on-line access to trading securities through the electronic medium, such as personal computers.  Ameritrade is a wholly owned broker-dealer subsidiary of TD Ameritrade Holding Corporation (formerly Ameritrade Online Holdings Corp. and, before that, Ameritrade Holdings Corporation) ("Ameritrade Holdings"), which stock is traded on the NASDAQ stock market.  Ameritrade is Ameritrade Holdings' principal retail broker-dealer and acts as an introducing broker for retail brokerage customers. Ameritrade Holdings also is a Delaware corporation with its principal place of business in Omaha, Nebraska and offices throughout the United States.

11.     Ameritrade is a registered broker-dealer with the SEC.  Ameritrade conducts business throughout the United States, including New York and Jersey City, New Jersey.

Ameritrade's target market is retail brokerage customers "who are price sensitive and comfortable using the Internet as a primary means to place trades, but who expect a fairly high level of service and the availability of a number of investment tools." (Ameritrade Holdings Form 10-K for the fiscal year ending September 29, 2000 at 1) (the "Fiscal 2000 Form 10-K")).

     a.     Ameritrade Holdings described Ameritrade's business at the beginning of the Class Period as follows:

> We provide technology-based brokerage services primarily to retail investors through a variety of mediums, predominately through the Internet. Our services appeal to a broad market of self-directed retail investors, financial planners and organizations who are value conscious. We use our low-cost platform to offer brokerage services to investors at commissions that are generally lower than commissions charged by our major competitors. ***Our goal is to provide the best execution using the best information at the best price.***

Fiscal 2000 Form 10-K at 1 (emphasis added).

     b.     Ameritrade Holdings, at the beginning of the Class Period was 50% owned by its founder, Chairman of the Board, and Chief Executive Officer, J. Joe Ricketts ("Ricketts"). During the Class Period, Ameritrade Holdings owned approximately 8 million shares or up to 7% of the common stock of Knight Holdings. Ameritrade Holdings and Ameritrade "derived significant revenues from Knight in exchange for routing trade orders to them for execution." Fiscal 2000 Form 10-K at 12.

## SUBSTANTIVE ALLEGATIONS

### The Mechanics of Purchasing and Selling Options

     12.     An "option" is a contract that provides the owner, or "holder," with the right, but not the obligation, to purchase and/or sell a specified amount of a particular underlying interest (as used herein, the underlying interests are equity securities), at a fixed price, referred to as the "exercise" or "strike" price, by "exercising" the option before its specified expiration date. An

option that provides a right to purchase a fixed amount of the underlying interest is a "call option," and an option that provides a right to sell the underlying interest is called a "put option."

13.     The market for the purchase or sale of options publicly traded on the options exchanges is supplied by registered securities brokers known as specialists or Options Specialists (*i.e.*, persons engaged in the business of effecting transactions for the purchase and sale of securities for the accounts of others) and dealers (*i.e.*, persons engaged in the business of buying and selling securities for their own accounts) who are members of one or more exchange. These specialists and dealers are obligated to make markets in options by quoting bid and offer prices and executing offers to purchase and sell options that are listed and traded on the exchanges.

14.     The "bid" price is the highest price at which a given broker/dealer, known as a market maker, is willing to buy a particular option, and the "ask" price is the lowest at which any given market maker is willing to sell that option. The difference between the lower bid price and the higher ask price is referred to as the "bid-ask spread" or the spread ("Spread").

15.     The factors that generally affect the pricing of a stock option include such variables as the current value of the underlying stock and the relationship between that value and the exercise price, the individual forecasts of the future volatility of the underlying stock made by the various market makers who trade the options on the exchanges, the historical volatility of the underlying stock, the amount of time remaining until expiration, cash dividends payable on the underlying stock, current interest rates, the depth of the market for the option, the effect of supply and demand in the markets for the option and the underlying stock, and the individual estimates of future developments that might affect any of the foregoing that are made by the market makers who trade the option.

16.     Options Specialists have each developed highly-sophisticated computer software programs that electronically establish and instantaneously update and revise the bid and ask quotes that they disseminate for the options that they purchase and sell. Such price quotes are based upon information that the Options Specialists input concerning the options pricing variables that are listed in the paragraph above and how the prices are affected by changes in the variables that occur over the course of each trading day.

17.     Options Specialists are supposed to "provide competitive, liquid, and orderly markets for the purchase and sale of standardized options." A group of registered market makers and specialists, establish, maintain, and disseminate bid and ask quotations for established amounts of particular options at designated "posts" located on the floors of each options exchange.

18.     Options are purchased and sold on the exchanges pursuant to modified forms of two trading systems:

        a.      a multiple market maker system in which customers directly and/or through floor brokers acting as their agents, sell options to and buy options from the various members that make a market in the particular option that the customer wishes to sell or buy; and

        b.      an auction system in which orders to buy and sell options are either matched against one another by a specialist, or are matched with counterbalancing offers from the specialist itself, who is essentially required to act as a market maker of last resort.

19.     Market makers usually act only as principal, buying or selling for their own accounts. By contrast, specialists can act as both principal and agent when executing offers to

8

purchase or sell options and, thus, are required to continuously establish two-sided markets and must also provide the best bid and ask prices on the floor.

20.     The vast majority of options transactions occur at, or slightly inside, the "Spread." This means that in most instances market makers execute orders to buy an option at the bid price and orders to sell that option at the higher offer price and keep the difference between the two prices, *i.e.*, the Spread, as payment for their market-making services. A major source of every market-maker's profit – and a significant element of customers' costs in executing options orders with market makers on an exchange – is the difference between the bid and ask prices for a given option. Thus, the wider the Spreads, the greater the market makers' individual and collective revenues and profits.

**The Execution of Option Orders**

21.     Options Specialists are members of one or more options exchange. They are charged with maintaining a fair and orderly market in one or more securities. The Options Specialists execute orders, including limit-orders, on behalf of other members, such as Defendant Ameritrade, a registered stockbroker, for a portion of the broker's commission.

22.     The Options Specialists guarantee performance of the counter-parties to the transactions that take place on the exchange. Specialists are required by law to provide real-time quotations of stock option prices, including bid and ask quotes, at which public customers, such as Plaintiff and the other members of the Class, can buy and sell options contracts.

23.     Options Specialists all maintain systems to allow equity options investors, such as Plaintiff and the other members of the Class, to see real time bid and ask prices on their computer screens. One way the Options Specialists disseminate these price quotations is through their various electronic transfer or display systems. Once the real-time price is displayed on his

or her computer screen, the public customer, directly or indirectly through his or her broker, may buy or sell the option by clicking on the price shown on the screen.

24.     In Ameritrade's "Glossary of Terms," as it appeared on its website in 2002, the term "Marketable Limit Order" was defined as follows:  "Any buy order with a limit price equal to or greater than the National Best Offer at the time of order receipt, or any sell order with a limit price equal to or less than the National Best Bid at the time of order receipt."  Thus customer limit orders falling within the National Best Offer or National best Bid were considered marketable limit orders.

**Ameritrade's Contractual Obligations**

25.     The Terms and Conditions of the brokerage agreement entered into by Plaintiff and other members of the Class states as follows:

> Ameritrade, Division of Ameritrade, Inc. (Ameritrade) is a discount brokerage firm.... Ameritrade is an order taker that *accepts client orders to buy or sell securities and delivers those orders to the appropriate market, market maker, or electronic communications network ("ECN") for execution.*  Client trades are executed on independent exchanges or through market makers or by ECNs.  Ameritrade, Inc. is a self-clearing, broker-dealer. Acting in its capacity as clearing agent, Ameritrade will deliver client orders to the exchange, market maker or ECN, prepare client trade confirmations and client statements, settle security transactions, perform designated cashiering functions, and prepare certain books and records related to reported security transactions. (Emphasis added).

26.     The contract further states (6) that:

> 6. In all securities, options, and mutual fund transactions, Ameritrade is acting as my agent, except when Ameritrade discloses to me in writing, at or before the completion of a particular transaction, that it is acting as broker for some other person....

27.     Defendant's contracts with Plaintiff and other class members contain express terms regarding the execution of option trades. In the Terms and Conditions of the agreement between plaintiff and Ameritrade, there is a subsection entitled:   "How Your Account Is Managed" which provides ( in pertinent part):

> All transactions under this Agreement are made subject to the constitution, rules, regulations customs and usage of the exchange or market and its clearinghouse, if any, where Advanced or its agents execute the transactions.
>
> Stock orders are routed via an electronic matrix to a listed, NASDAQ, or over-the-counter agent, depending upon the security being ordered. Ameritrade and Advanced cannot accept requests to route orders to a specific exchange for execution. Ameritrade or Advanced receives cash payments for routing any stock orders for execution to certain agents on specific listed, NASDAQ, and over-the-counter securities. These agents are market makers and they carry inventory in their specific securities, which allows for price improvement to the retail customer for securities ordered through their inventory. Accordingly, any order is always executed at the "best bid," "best offer," or at price superior to the other one by virtue of the market maker's inventory positioning capability.

28.     As a result of Ameritrade acting as Plaintiff's and class members' agent or broker in connection with their account trades, these market makers and/or specialists who were Ameritrade's agents were, thus, also agents of each member of the Class.

29.     With respect to options, The Terms and Conditions further provide:

> Options Trading
> The provisions of this options account agreement are supplementary to the cash and margin accounts agreements I have signed. Unless specifically amended by this agreement, all terms and conditions applicable to any options transactions handled for any account shall remain effective.

30.     With regard to options trading, the agreement between Plaintiff and Ameritrade specifically incorporates by reference (139) the rules and regulations of certain regulators, exchanges and markets:

> All my option transactions are subject to the rules and regulations of the Options Clearing Corporation, the Chicago Board Options Exchange or the appropriate options exchange, and the National Association of Securities Dealers, Inc.

31.     As part of their agreement with customers who purchased and sold options on-line, Ameritrade agreed to provide these retail customers (such as Plaintiff and the other members of the Class) with real-time quotations of options' bid and ask prices on the Internet or through other electronic on-line facilities. The Agreement states:

> Ameritrade provides secure Internet, trading and brokerage services through Web sites. I agree to receive and transmit financial information through such electronic means.

32.     Ameritrade also agreed that customer limit buy orders at the posted ask price and limit sell orders at the posted bid price would be distributed to multiple market centers for best execution at those prices, in accordance with all applicable rules, regulations, and laws and custom and usage of the exchange, markets, and clearing houses, as described in ¶¶ 25, 27 and 31 herein.

33.     On Ameritrade's customer account website, in December 2002, Ameritrade described its order routing system as follows:

> Our sophisticated order routing technology allows us to dynamically distribute orders to multiple market centers. The goal? To seek the best execution of your online order, leveraging a competitive combination of speed, price, and liquidity.

As described below, no distribution of Plaintiff's orders to multiple market centers occurred as they were only routed to the AMEX despite the fact that Plaintiff could likely have obtained an execution at an options exchange other than the AMEX.

34.     Ameritrade further explained the method of obtaining execution of customers' orders:

What is auto-execution?

> Auto-execution is a threshold established by a liquidity provider (market maker) that allows for the automated execution of orders regardless of the actual displayed size on the National Best Bid and Offer (NBBO). In an attempt to increase the likelihood that your order is executed in its entirety, Ameritrade routes orders to numerous liquidity providers that offer auto-execution. Auto-execution, however, is never guaranteed. It can be decreased or discontinued at will by the liquidity provider.

35.     The core of Ameritrade's agreement with Plaintiff and the other members of the Class was that Ameritrade's technology and relationships permitted such customers access to executions of orders on essentially the same terms as were available to institutional traders. Thus, Ameritrade agreed (1) to display quotes on the customer's computer monitor which were firm quotes at which transactions would occur, *i.e.*, a customer that placed an order at the price displayed when the order was placed would have the transaction executed at the price listed, and (2) when the customer "clicks" on the represented price (either to buy or sell) (or otherwise indicates on his or her computer screen the nature of the order) the transaction would be distributed to multiple market centers and executed.

36.     Incorporated into the agreement between plaintiff and Ameritrade is the contractual obligation on the part of Ameritrade to comply with certain regulatory rules including:

> (a) the firm quote rule applicable to options (*e.g.* AMEX Rule 958A and SEC Rule 11Ac1-1;
>
> (b) the rule requiring brokers to use "due diligence" to execute market or limit orders at the best price available; (*e.g.* AMEX Rule 156)
>
> (c) the rule requiring that the best bid or offer shall have precedence at all times; (*e.g.* AMEX Rule 126); and

(d) the "best execution" rule (NASD Rule 2320).

37.     These obligations were further described in Ameritrade's customer materials

under "Frequently Asked Questions".   Ameritrade described its obligations as a broker as

follows:

> What is best execution?
> Best execution is a broker/dealer's obligation to seek the best terms
> reasonably available when executing a transaction on behalf of a
> client.   While there is no one standard of what determines best
> execution,   speed   of   transaction,   execution   price,   price
> improvement opportunity and liquidity are typically listed by our
> clients as the factors that are most important to them.   Simply put,
> most of our clients want their orders filled in their entirety, as fast
> as reasonably possible and at the price they were quoted or better.

38.     Further the importance of routing orders to multiple market centers also was

described by Ameritrade:

> Are all brokers obligated to seek best execution?
> There are numerous factors that can affect the terms of execution.
> The most common factors include, but are not limited to:   current
> market conditions, volatility, size and type of order, the number of
> available primary markets for a particular security, the number of
> primary markets checked and the likelihood of execution.

39.     During the Class Period and pursuant to their respective agreements with

Ameritrade, Plaintiff and members of the Class entered into agreements with Ameritrade which

enabled them to obtain price quotations on options listed on their personal computers.   Thus,

Plaintiff and members of the Class had the ability to place orders that Ameritrade (their broker

and agent) then directed to an multiple market centers.

40.     Defendant breached its contract with Plaintiff and members of the Class by failing

to distribute market and limit orders to multiple market centers.

41.   Defendant breached its contract with Plaintiff and members of the Class by failing to execute trades in conformity with the industry practice of executing limit orders which matched or were better than the quoted prices.

42.   Defendant breached its contract with Plaintiff and members of the Class by failing to route orders to an exchange which matched the quoted prices.

43.   Defendant breached its contract with Plaintiff and members of the Class by failing to execute option trades at the best bid or best offer available through its designated agent.

44.   Defendant breached its contract with Plaintiff and members of the Class by failing to execute orders at the posted quote in violation of the firm quote rule through its designated agent.

45.   As a direct and proximate result of Ameritrade's misconduct, Plaintiff and the other members of the Class, suffered damages because orders to purchase or sell options within the real-time displayed quotes that were placed by Plaintiff and the other members of the Class were not executed or not directed to multiple exchanges where execution could have occurred, thereby causing Plaintiff and the other members of the Class to forego profits or suffer losses.

**Plaintiff's Transactions in Forest Labs Options**

46.   As an example of Ameritrade's breach of contract, in or about December 2002, Gurfein purchased and then attempted to sell equity options on Forest Labs through the transmission of marketable limit-orders via online transmission from her home computer, through the facilities of Ameritrade, which ultimately routed her orders to the AMEX trading floor.

47.     On or about December 4, 2002, Gurfein purchased 50 Forest Labs December 100 put contracts (FXAXT) at a price of $0.90 per contract for a total price of $4,500.00 (exclusive of commissions).

48.     Two days later, on December 6, 2002, the value of the FXAXT contracts had increased to almost $8.00 per contract.

49.     Accordingly, on December 6, 2002, at 8:52:54 AM (CST), the electronically displayed "bid" on FXAXT was $7.70 (the price that a buyer was willing to pay for the put) and the "ask" (*i.e.*, the price that a seller was willing to sell a put) was $8.00.

50.     Thus, if a seller placed an order or otherwise accepted the "bid" at $7.70 (or less), that transaction should have been executed upon presentment.

51.     These bid and ask prices were electronically displayed on Gurfein's computer through Ameritrade's facilities.

52.     At 8:53:34 (CST) Plaintiff placed a limit-order to Ameritrade via the Internet to sell 50 FXAXT contracts at $7.70.

53.     Under its agreement with Gurfein, Ameritrade was to immediately route her order to the market for execution upon presentment.

54.     Ameritrade's agreement called for Plaintiff's order to be distributed to multiple market centers.

55.     In fact, at the same moment that Gurfein placed her order, the displayed bid actually increased to $7.80, so that Gurfein was actually willing to sell the contracts for a lower price than was being bid, an indication that Ameritrade failed to send the limit order to the appropriate options exchange.

56.     Gurfein's limit order was not distributed to multiple market centers as agreed to by Ameritrade.

57.     Gurfein's limit order was not executed (either in whole or in part) upon presentment as Ameritrade agreed it would be because Ameritrade failed to send it to the appropriate options exchange.

58.     So at 8:56:21 AM (CST) Gurfein cancelled that order and replaced it with another order that was at or below the electronically displayed bid, which similarly should have been executed upon presentment.

59.     However, it also was not. This scenario was repeated several times, and each time that the order should have been distributed to multiple market centers for execution upon presentment– because the limit-order sell price was at or below the posted "bid" price – it was not.

60.     Plaintiff's cancellation and re-entry of her orders were simply attempts to mitigate the damages being incurred from Ameritrade's continuing breach of contract.  Subsequently, Plaintiff was informed by Ameritrade that her order was routed only to the AMEX and not to one of the other alternative markets as required by Ameritrade's promise to use multiple market centers or options exchanges..

61.     Because of Ameritrade's failure to provide the services to Gurfein that it had agreed to, Gurfein was required to cover by using an alternate means, a "work-around," to salvage a rapidly decreasing unrealized gain.  Gurfein ultimately exercised the 50 FHAXT contracts by purchasing 5000 common shares of Forest Labs (FRX), the underlying security; she purchased 100 shares at $94.90/share and 4900 shares at $94.97/share.  She immediately sold the 5,000 shares for $100 per share for a profit of $24,157, less the cost of the options, which made

the profit approximately $20,500. Had the initial options sell order been executed timely, the gross proceeds would have been $34,000, *i.e.*, $7.70 – $0.90 – $6.80 x 5,000 = $34,000. Thus, Plaintiff was deprived of approximately $13,500 of profits by Ameritrade's failure to distribute and execute her orders as it had agreed to do.

62.   Between October 11, 2002 and November 19, 2002 Gurfein purchased and accumulated 100 Forest Labs February 85 Puts (FHANQ).

63.   These puts were purchased at prices ranging from $2.00 per contract to $6.00 per contract for a total purchase price of $39,850 (exclusive of commissions).

64.   On December 6, 2002, the same day that Gurfein attempted to sell the Forest Labs December 100 puts, she submitted orders to sell 100 contracts of FHANQ at $4.50, which price was also below the bid displayed and represented by Ameritrade on Gurfein's computer at that time.

65.   Under the terms of Gurfein's contract with Ameritrade, that limit order and subsequent limit orders should have been distributed to multiple market centers and executed.

66.   Instead, of these 100 contracts, only 25 contracts were sold and at a significantly lower price of $3.00 for a loss of $3,750, *i.e.*, $4.50 – 3.00 = $1.50 x 2500 = $3,750.

67.   Subsequently, as a result of a 2-for-1 split, the remaining 75 contracts were converted to 150 FHANV, which were sold on January 21, 2003 at $0.20 equivalent to $3,000.

68.   This, when compared to 75 contracts at $4.50 (or $33,750), resulted in a negative differential of $30,750.

69.   The total damages suffered by Gurfein as to the FHANQ matter was $34,500.

## CLASS ACTION ALLEGATIONS

### General Class Action Allegations

70.     Plaintiff brings this action as a class action pursuant to rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of herself and all others similarly situated who were Ameritrade account-holders who used their Ameritrade electronic on-line accounts to place and/or direct limit-orders which matched the displayed quotation price to open and/or close put or call equity options positions with respect to all equity options listed on the exchanges from April 2, 2001 (the date on which the AMEX's firm quote rule became effective) through the date of this Complaint (the "Class Period") that were not executed at the displayed quotation price (the "Class"). As set forth in greater detail below, the SEC Report established that the failures visited upon Plaintiff with respect to her Ameritrade account and option orders that were supposed to be executed, routinely occurred on the AMEX with respect to other members of the Class as well.

71.     Excluded from the Class are Defendant and each of its parents, subsidiaries, affiliates, officers, directors, and employees as well as all entities in which Ameritrade has a controlling interest and the successors, affiliates, or assigns of any of the foregoing excluded persons and entities.

72.     The persons in the Class are so numerous that joinder of all members is impracticable. As of September 24, 2004, Ameritrade had more than 3.5 million accounts with an aggregate value of approximately $68.8 billion. While the exact number is unknown, Plaintiff believes that during the Class Period, thousands of Ameritrade customers placed thousands of limit orders which matched or were better than the displayed quotation price to purchase or sell

equity options that Ameritrade failed to direct to multiple market centers for execution in breach of Ameritrade's contractual obligations.

73.     Plaintiff's claims are typical of the claims of other members of the Class. Plaintiff, and other members of the Class, entered into brokerage agreements with Ameritrade with respect to the latter's providing brokerage services related to the class member's purchase and sale of listed stock options, and each such agreement contained substantially the same essential terms with respect to the services that Ameritrade agreed to provide. Plaintiff and the members of the Class were electronic or on-line customers of Ameritrade. Their limit-orders to buy or sell option contracts which matched the displayed quotation price were not distributed to multiple market centers or executed by Ameritrade at the electronically-displayed quotation in breach of Ameritrade's contractual obligations. As a result Plaintiff and the other members of the Class sustained damages.

74.     Plaintiff's claims are typical of the claims of members of the Class, whose limit-orders to buy or sell option contracts which matched the displayed quotation price were not distributed to multiple market centers or executed at the electronically displayed quotations by Ameritrade and who thus sustained damages as a result of Defendant's wrongful conduct.

75.     Plaintiff is a representative party who will fairly and adequately protect the interests of the other members of the Class. Plaintiff has retained counsel competent and experienced in class action litigation and in litigation involving securities transactions such as listed equity options. Plaintiff has no interests that are antagonistic to, or in conflict with, the Class that she seeks to represent.

76.     A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein. As the damages suffered by the individual class

members may be relatively small, the expense and burden of individual litigation make it virtually impossible for class members individually to redress the wrongs done to them. The likelihood of individual class members prosecuting separate claims is remote. Plaintiff anticipates no unusual difficulties in the management of the action as a class action.

77.     There are questions of law and fact common to the Class that predominate over any questions of law and fact solely affecting individual members of the Class, including:

    a.     whether Ameritrade had a contract with Plaintiffs and members of the Class;

    b.     whether Ameritrade breached its contractual obligations to Plaintiff and other members of the Class by systematically failing to either distribute limit purchase or sale orders to multiple market centers or to execute limit purchase or sale orders that matched or were better than the electronically displayed quotes; and

    c.     whether Plaintiff and the other members of the Class have sustained damages and, if so, what is the proper measure thereof;

***Additional Class Action Allegations Regarding the SEC Report***

78.     Ameritrade's failure to execute Plaintiff's limit orders at the limit price was not an isolated or atypical occurrence with respect to its other customers (and other members of the Class). Plaintiff believes that Ameritrade similarly breached its contractual obligations to thousands of its other customers under circumstances similar to those of Plaintiff. The SEC, based upon numerous complaints from small retail investors about violations of the Firm Quote Rule at the AMEX, performed an extensive investigation into the manner in which options transactions from other electronic on-line customers referred to as Direct Access customers, were executed on the AMEX and issued in a Report in June, 2003. According to the SEC, its

"analysis revealed significant disparities in the way specialists handled orders from Direct Access firms (i.e. firms that offered on-line trading services) versus orders received from other firms."

79.     According to the SEC Report, when the AMEX Options Specialists were not "busy" with any other orders, 37.6% of limit-orders from Direct Access customers went unfilled while only 5.2% of orders from all other customers went unfilled. The SEC Report observed that this was a likely violation of the Firm Quote Rule, due diligence and priority rules. The SEC also found that, as options specialist post activity increased, the chance of receiving an execution decreased at a higher rate for Direct Access customers versus other customers. When the AMEX Options Specialists were "busy" (for purposes of the SEC's analysis, when the specialists had received ten or more orders in the previous 30 seconds), the Direct Access customers had only an 11.2% chance of receiving an execution, while all other customers had an 87.6% chance of receiving an execution. Orders from Direct Access and other electronic or on-line customers were, under all conceivable trading conditions, far less likely to receive proper execution as compared with orders from all other customers.

80.     The SEC Report makes clear that violations of the Firm Quote Rule were widespread, routine, and systemic and thus Plaintiff's individual circumstances are not unique. The Report states:

> [E]ven a cursory review of one of the AMEX's firm quote exception reports revealed that AMEX specialists appeared to fail to honor their disseminated quotes at high rates in response to orders from public customers, and at even higher rates in response to orders from Direct Access firms.

## CLAIM FOR RELIEF
### (Breach of Contract)

81.    Plaintiff brings this claim on behalf of the Class and realleges each and every allegation contained in all of the foregoing paragraphs as if fully set forth herein.

82.    During the Class Period, Plaintiff entered into (or had) a contract with Ameritrade for good and valid consideration.  In exchange for payment of fees on her transactions, Ameritrade agreed to provide services described herein.

83.    During the Class Period, Ameritrade made contractual promises concerning Ameritrade's procedures for distribution and execution of orders.

84.    The foregoing statements set forth standard contractual obligations undertaken by Ameritrade in its accounts with Plaintiff and the other members of the Class.

85.    Ameritrade, as described above, failed to distribute to multiple market centers or execute limit orders which matched quoted bid and offer prices submitted by Plaintiff and the other members of the Class and thereby breached its contract with Plaintiff and the other members of the Class.

86.    Defendant breached its contract with Plaintiff and members of the Class by failing to distribute market and limit orders to multiple market centers.

87.    Defendant breached its contract with Plaintiff and members of the Class by failing to execute trades in conformity with the industry practice of executing limit orders which matched the quoted prices.

88.    Defendant breached its contract with Plaintiff and members of the Class by failing to route orders to an exchange which matched the quoted prices.

89.    Defendant breached its contract with Plaintiff and members of the Class by failing to execute option trades at the best bid or best offer available through its designated agent.

90.     Defendant breached its contract with Plaintiff and members of the Class by failing to execute orders at the posted quote in violation of the Firm Quote Rule through its designated agent.

91.     Ameritrade, as described above, failed to execute orders submitted by Plaintiff and the other members of the Class at the "best bid," "best offer," or "at a price superior to other ones," through its agents or sub-agents and thereby breached its contract with Plaintiff and the other members of the Class to obtain the best execution.

92.     As a direct result of Ameritrade's actions and/or omissions, Plaintiff and the other members of the Class suffered damages including, but not limited to, lost profits, loss of business, amounts of overpayments and interest, in an amount to be proven at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

(i)     Certifying this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as the Class Representative and her chosen counsel as Class Counsel;

(ii)    Awarding monetary damages against Defendant in favor of Plaintiff and other members of the Class for all losses and damages suffered as a result of the acts and transactions complained of herein; and

(iii)   Awarding Plaintiff the costs of this action together with reasonable attorneys' fees, expert fees and such other and further relief as this Court deems necessary and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all questions of fact raised by the Complaint.


Dated:  New York, New York
       January 30, 2007

               **LOVELL STEWART HALEBIAN LLP**


               By: _____
                   John Halebian (JH-8005)
                 Frederick W. Gerkens, III (FG-7595)
               500 Fifth Avenue
               New York, New York 10110
               Tel:  212-608-1900

               **Lead Counsel for Plaintiff and the Class**

               **SQUITIERI & FEARON LLP**
               Olimpio Lee Squitieri (OLS-1684)
               Daniel R. Lapinski (DRL-7447)
               32 East 57th Street, 12th Floor
               New York, New York 10022
               Tel: 212-421-6492

               **ZWERLING, SCHACHTER &**
               **ZWERLING, LLP**
               Richard A. Speirs (RS8872)
               41 Madison Avenue
               New York, NY  10010
               Tel:  212-223-3900
               Fax:  212-371-5969

               **HANZMAN & CRIDEN, P.A.**
               Michael E. Criden
               220 Alhambra Circle
               Suite 400
               Coral Gables, Florida 33134
               Tel:  305-357-9000
               Fax:  305-357-9050

               **Counsel for Plaintiff**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

HADASSAH GURFEIN, individually and on behalf                 :
of all others similarly situated,                           :
                                                            :
                                        Plaintiff,          :          04 Civ. 9526 (LLS)
                                                            :
                                                            :
                        v.                                  :
                                                            :
AMERITRADE, INC.,                                           :
                                                            :
                                        Defendant.          :
-------------------------------------------------------------------X

### CERTIFICATE OF SERVICE

Kenneth Smith, pursuant to 28 U.S.C. §1746, declares:

1. I am not a party to this action, am over eighteen years of age, and reside in Hillsdale,

New Jersey.

2. On January 31, 2007 I caused to be served a copy of Plaintiffs' Third Amended Class

Action Complaint, upon

Richard John Morvillo
Mayer Brown Rowe & Maw, LLP (DC)
1909 "K" Street, N.W.
Washington DC  20006-1101
**Attorneys for Defendant Ameritrade Inc.**

Via First Class Mail, by placing a copy, in a properly addressed, postage paid envelope, in a

depository under the care and control of the united States Post Office.

3. I declare under penalty of perjury that the foregoing is true and correct.  Executed on

January 31, 2007.

_____
                              Kenneth Smith